IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WENDY VANESSA MARTIN, | CV 21–17–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Wendy Vanessa Martin brings this action under 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act ("SSA").  The Court will affirm the Commissioner's decision and dismiss this case because substantial evidence supports the Administrative Law Judge's ("ALJ") findings that Martin is not disabled within the meaning of the SSA.

## BACKGROUND

On December 9, 2016, Martin filed an application for a period of disability and disability benefits under Title II of the SSA, alleging that she became disabled on May 7, 2015.  (Doc. 10 at 20.)  Her claims were denied initially on April 7, 2017, and upon reconsideration on November 28, 2017.  (*Id.*)  Martin requested a

1

hearing, and she testified and was represented by counsel at an administrative hearing on March 12, 2020, to review her denial of benefits.  (*Id*.)

On May 8, 2020, the ALJ issued a decision denying Martin's claim for disability insurance benefits, finding that Martin was not "disabled" under the SSA.  (*Id*. at 17–35.)   The Appeals Council denied her request for review on December 7, 2020, thereby making the ALJ's decision final.  (*Id.* at 6.)  Martin filed this action for judicial review pro se.  Jurisdiction vests with the Court pursuant to 42 U.S.C. § 405(g).

## LEGAL STANDARDS

### I.      Standard of Review

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing."  42 U.S.C. § 405(g).  A district court may set aside an ALJ's findings only if they are "based on legal error or are not supported by substantial evidence." *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002).  The Supreme Court has defined substantial evidence only as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  The substantial evidence standard of review "defers to the presiding ALJ, who has seen the hearing

up close." *Id.* at 1157.  "Where evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  "A decision of the ALJ will not be reversed for errors that are harmless."  *Id.*

Courts "make reasonable allowances for pro se litigants and . . . read pro se papers liberally."  *McCabe v. Arave*, 827 F.2d 634, 640 n.6 (9th Cir. 1987).

## II.    Disability Determination

To qualify for disability benefits under the Social Security Act, a claimant bears the burden of proving that (1) they suffer from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the claimant incapable of performing past relevant work or any other substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process.  20 C.F.R. § 404.1520.  If a claimant is found to be "disabled" or "not disabled" at any step, the ALJ need not proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005).  The claimant bears the burden of proving a disability at steps one through four of this process. *Burch*, 400 F.3d at 679.

At step one, the ALJ considers whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If so, then the claimant is not disabled within the meaning of the Social Security Act.

At step two, the ALJ must determine whether the claimant has any impairments, singly or in combination, that qualify as severe under the regulations.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will proceed to step three.

At step three, the ALJ compares the claimant's impairments to the impairments listed in the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the ALJ finds at step three that the claimant's impairments meet or equal the criteria of a listed impairment, then the claimant is considered disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  "The mere diagnosis of an impairment listed in Appendix 1 is not sufficient to sustain a finding of disability."  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).  "For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  In other words, "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id*.

If an impairment fails to match a listing in Appendix 1, it may nevertheless be "medically equivalent to a listed impairment" if the claimant's "symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria" of

4

a listed impairment.  20 C.F.R. § 404.1529(d)(3).  A claimant must explicitly raise equivalency issues regarding impairment listings before the ALJ because the ALJ has no obligation to discuss it sua sponte.  *Ford v. Saul*, 950 F.3d 1141, 1157 (9th Cir. 2020).

If the ALJ proceeds beyond step three, she must assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The claimant's residual functional capacity is an assessment of the work-related physical and mental activities the claimant can still do on a regular and continuing basis despite her limitations.  20 C.F.R. § 404.1545(a); Social Security Ruling (SSR) 96-8p.  The assessment of a claimant's residual functional capacity is a critical part of steps four and five of the sequential evaluation processes.

At step four, the ALJ considers whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant establishes an inability to engage in past relevant work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v), (g).  The Commissioner may satisfy this burden through the testimony of a vocational expert or by referring to the Medical-Vocational Guidelines set forth in

5

the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner

meets this burden, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(v).

## DISCUSSION

The ALJ followed the five-step sequential process in evaluating Martin's

claim.  At step one, the ALJ found that Martin met the insured requirements of the

Social Security Act through December 31, 2020.  (Doc. 10 at 22.)  The ALJ further

found that she has not engaged in substantial gainful activity since May 7, 2015,

the alleged onset date (20 C.F.R. § 404.1571, *et seq.*).  (*Id.*)

At step two, the ALJ found that Martin had the following severe

impairments: degenerative disc disease of the cervical and lumbar spine,

fibromyalgia, obesity, asbestos lung disease, depression, and anxiety (20 C.F.R.

§ 404.1520(c)).  (*Id.*)  The ALJ determined these impairments significantly limit

Martin's ability to perform basic work functions.  (*Id.*)

At step three, the ALJ concluded that Martin does not have an impairment or

combination of impairments that meets or medically equals the severity of one of

the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R.

§§ 404.1520(d), 404.1525, 404.1526).  (*Id.* at 22–25.)  The ALJ found that Martin

had the residual functional capacity to perform light work as follows:

> [T]he claimant has the residual functional capacity to perform
> sedentary work as defined in 20 CFR 404.1567(a) except: She can lift,
> carry, push, and pull 20 pounds occasionally and 10 pounds frequently.
> She is limited to standing or walking for no more than 2 hours total in

6

an 8 hour day and sit for up to 8 hours total in an 8 hour day.  She can never climb ladders, ropes, or scaffolds.  She can occasionally climb ramps and stairs, as well as balance, stoop, kneel, crouch, or crawl.  She should have no exposure to greater than moderate noise level as defined in the Selected Characteristics of Occupations.  She should have no exposure to unprotected heights, moving mechanical parts, or workplace hazards.  She cannot be exposed to extremes of cold and heat, or to vibration.  She would be limited to low stress work, defined as understanding, remembering, and carrying out simple routine tasks in a job not requiring not more than simple work related decisions.  She can have not more than occasional changes in routine work setting and job duties.  There can be no high production or pace work like you would expect to see on an assembly line, but she would fill a quota as long as she can control the pace of that work.  After standing or walking for no more than 10 minutes, she would have to sit for 5 minutes before resuming standing or walking.  She would be limited to sitting for no more than 1 hour before she would need to stand and stretch at the workstation for 1 minute before resuming a seated position.

(*Id.* at 25.)

At step four, the ALJ found that Martin was unable to perform past relevant work as a social services worker because the demands of such work exceed her residual functional capacity.  (*Id.* at 34.)  Proceeding to step five, the ALJ found, based on the vocational expert's testimony, that there were other jobs existing in significant numbers in the national economy that Martin could perform, including office helper (74,000 jobs in the national economy, eroded by 50% due to change of position for sitting, standing, and walking limitation in her residual functional capacity), document preparer (50,000 jobs in the national economy), food and beverage order clerk (177,000 jobs in the national economy), and charge account clerk (186,000 jobs in the national economy).  (*Id.* at 34–35.)

In her opening brief, Martin argues that her asbestosis, degenerative disc disease, fibromyalgia, and depression and anxiety disorder prevent her from performing any substantial work activity, asserting that the ALJ "did not consider [her] continued physical and mental impairments which cause [her] to be unable to perform even routine daily life activities." (Doc. 12.)  The Court construes these arguments as challenging the ALJ's findings at step three and findings concerning her residual functional capacity for lack of substantial evidence.

### I.   Martin's Pulmonary Impairment

Martin asserts that her diagnosis of asbestosis limits her "ability to function daily and makes it difficult to do any excessive physical or repetitive work."  (Doc. 12 at 1.)  She therefore disagrees with the ALJ's findings that she is not disabled because she allegedly cannot perform any physical labor because her asbestosis causes shortness of breath, which would limit any substantial work activity.  (*Id*.)

Martin does not argue that she met or equaled a specific impairment listing that the ALJ failed to consider.  Martin's objective respiratory test findings did not meet or exceed the levels required for chronic respiratory disorders other than cystic fibrosis (Appendix 1 § 3.02).  (*E.g.*, Doc. 10 at 300 (SpO2 99% on May 9, 2015), 392 (95% O2 saturation on December 6, 2016), 388 (97% O2 saturation on January 5, 2017), 398 (FVC 2.11, 60% of predicted; FEV1 1.87, 66% of predicted; DLCO 24.06, 104% of predicted, on March 28, 2017), 1319 ("O2 SATS WNL

8

[within normal limits] on room air" on May 23, 2019), 1761 (97% O2 saturation

on January 29, 2020).)  Nor did the record reflect any respiratory-disease-related

exacerbations or complications requiring hospitalization or any ventilation, which

prevented her from proving that her pulmonary impairment meets or equals the

listings for asthma (§ 3.03), bronchiectasis (§ 3.07), and respiratory failure

(§ 3.14).  (*See generally id*. at 705–1723.)  Accordingly, substantial evidence

supports the ALJ's determination that Martin's pulmonary impairment did not

meet or exceed the severity of a respiratory listing.

Likewise, the ALJ did not err when considering Martin's asbestosis in

determining her residual functional capacity.  In addition to the objective medical

findings described above, an ALJ can consider the claimant's daily activities and

treatment received for symptoms.  20 C.F.R. §§ 404.1529(c)(3).  The ALJ

considered Martin's asbestos lung disease and subjective symptoms and properly

considered the objective testing and other exam findings as well as the

recommended conservative course of treatment in determining her residual

functional capacity.  (Doc. 10 at 23, 27–28, 32.)  The ALJ observed that "[t]here

were very few references in the record to treatment relating to asbestos exposure"

and noted that Martin's complaints of shortness of breath could be due to her

obesity and general deconditioning rather than an underlying asbestos-related

condition.  (Doc. 10 at 27–28.)  The ALJ evaluated the treatment advice from the

Center of Asbestos Related Disease and other providers that encouraged her to perform gentle exercise and concluded that this recommendation "suggests that her treatment provider felt that [Martin] was capable of" such exercise. (*Id.* at 33, 388–95.) The ALJ also considered Martin's unremarkable lung exams found in the administrative record. (*Id.* at 300, 304, 343, 361, 498, 515, 522.) The ALJ thus provided specific, clear, and convincing reasons for discounting the weight of Martin's subjective claims about her respiratory impairments, but nevertheless gave her claims the benefit of the doubt in formulating the limitations in her residual functional capacity. (*Id.* at 33.) Accordingly, the Court concludes that the ALJ's residual functional capacity determination was supported by substantial evidence.

## II.     Martin's Degenerative Disc Disease

Martin alleges that her degenerative disc disease causes her excessive back pain when she performs "too much" physical activity despite taking daily medication and receiving injections periodically. (Doc. 12 at 1.) She claims that she is confined to her bed "for several days" after performing light physical work and that she is "no longer able" to perform basic chores after her condition has worsened. (*Id.*) She claims that she is "unable to do any physical labor for any extended period" and therefore disagrees with the ALJ's determination that she can perform substantial work activity for an extended period. (*Id.*) She also notes that

10

her back pain has worsened but does not specify whether her condition worsened before or after the date of the administrative hearing. (*Id.*)

Although the ALJ acknowledged that Martin's degenerative disc disease was a severe impairment based on her allegations of pain, her husband's testimony, and medical imaging, the ALJ found that "Martin's impairments did not meet or equal listing 1.04." (Doc. 10 at 23, 27–28.)  The impairment listing at issue in effect at the time of the ALJ's decision read as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>     A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>     B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>     C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpt. P, App. 1 § 1.04 (eff. Feb. 24, 2020 to May 20, 2020).[1]

---

[1] None of the other impairment listings considered by the ALJ has been amended after the ALJ's decision, and this Order therefore cites to the current listing for each of those impairments.

In particular, the ALJ found that the criteria in 1.04(A) were not satisfied because Martin "does not have neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss (atrophy with associated muscle weakness or muscle weakness), accompanied by sensory or reflex loss and positive sitting and supine straight-leg raising tests." (*Id.* at 23.)  The ALJ further found that the criteria in 1.04(B) were not satisfied because Martin "does not have objectively confirmed spinal arachnoiditis, severe burning or painful dysesthesia, and does not need to change positions or posture more than once every two hours[,]" and the criteria in 1.04(C) were not satisfied because she could ambulate effectively.  (*Id.*)

The ALJ's findings are a reasonable interpretation of the record.  Although a July 2019 examination showed that Martin had moderately limited range of motion and mildly limited flexion in her lumbar spine (*id.* at 582), there is no evidence in the record of a positive straight-leg raising test (*id.* at 583 (negative test from same examination)), spinal arachnoiditis, or inability to ambulate effectively (*e.g.*, *id.* at 582–83 ("Gait: Normal")).  The only report of motor loss was a treating nurse practitioner's residual functional capacity assessment dated January 17, 2020, indicating that Martin had significant limitations in the use of her upper extremities, hands, and fingers (*id.* at 689), which was inconsistent with the physical examinations and self-reports in the record (*e.g.*, *id.* at 499 (showing upper extremity examination results of 5/5 push/pull resistance, normal tone and

12

muscle bulk and range of motion, and no abnormal movements in November 2017), 513–17 (showing no complaints of upper extremity pain or weakness and "5/5 strength of all muscle groups" during neurosurgery examination dated November 2019), 582–641 (showing no complaints of upper extremity pain or weakness to pain clinic in 2019), 690 (describing only "discomfort" in wrists and fingers during examination by arthritis specialist)). The ALJ appropriately found that this provider's opinion was entitled to only limited weight based on its lack of foundation in the objective medical findings and in Martin's self-reports (*id.* at 29–30). *See Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1996) (explaining that conflicts with objective evidence and self-reports can sustain rejection of opinion of treating physician). Accordingly, substantial evidence supports the ALJ's determination that Martin's degenerative disc disease did not meet or medically equal the severity of a listed impairment.

In assessing Martin's residual functional capacity, the ALJ recognized that her cervical and lumbar spine degenerative disc disease was "fairly severe at a mild to moderate level," but the record did not show that Martin "would be precluded from performing sedentary level exertional activity." (Doc. 10 at 28.) The ALJ provided a detailed summary of Martin's medical records dating back to 2015, including medical exams, self-reports to treatment providers, and treatment history concerning her spinal impairments. (*Id.* at 28–30, 33.) In particular, the ALJ

13

properly considered that Martin's "physical examination records were mostly
negative or normal," she reported improvements in pain with medication and
epidural steroid injections, she did not comply with recommendations to participate
in physical therapy or gentle exercise, and self-reports showed that she was capable
of performing some activities of daily living, including socializing, shopping, and
light physical activity.  (*Id.*)

Each of these considerations was appropriate.  An ALJ must engage in a
two-step analysis when "assessing the credibility of a claimant's testimony
regarding subjective pain or the intensity of symptoms."  *Vasquez v. Astrue*, 572
F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether there is
"objective medical evidence of an underlying impairment which could reasonably
be expected to produce the pain or other symptoms alleged."  *Id*. (quoting
*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  Second, if "there is
no evidence of malingering," the ALJ must give "'specific, clear and convincing
reasons'" for rejecting the claimant's testimony regarding the severity of their
symptoms.  *Id*. (quoting *Lingenfelter*, 504 F.3d at 1036).  The ALJ has "sufficient
basis for rejecting the claimant's subjective testimony" when the testimony
contradicts the medical record.  *Carmickle v. Comm'r, Soc. Sec. Admin*., 533 F.3d
1155, 1161 (9th Cir. 2008).  An ALJ also may "discredit a claimant's testimony
when the claimant reports participation in everyday activities indicating capacities

that are transferable to a work setting"; "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d, 1104 1113 (9th Cir. 2012), *superseded by rule on other grounds*, 20 C.F.R. § 404.1502(a) (defining acceptable medical source). Martin reported to treatment providers and testified at her hearing that she sometimes performed chores, shopped, and attended church. (*See, e.g.*, Doc. 10 at 52–54, 218–19, 408, 680.) The ALJ properly relied on this evidence to conclude that the evidence "does not suggest that the claimant is homebound[.]" (*Id.* at 26–27.)

An ALJ may also consider "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" when weighing a social security claimant's credibility. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039–40 (9th Cir. 2008). The ALJ found that Martin was repeatedly advised to engage in exercise or physical therapy to alleviate her pain, but she attended only two physical therapy sessions in 2015 and an unknown number of sessions that she discontinued because of pain in 2019, and she rarely reported regular exercise. (Doc. 10 at 27–30, 339–65, 372–73 (August 19, 2015 physical therapy evaluation), 376, 496, 516–17, 690–94, 1734, 1753, 1756, 1758, 1771, 1779.) Martin testified at her hearing that exercise "usually ends up causing more pain than it helps" but

admitted she "ha[d] trouble doing it consistently to make it . . . pay off." (*Id.* at 54–55.) The ALJ's consideration of Martin's failure to comply with these recommendations was permissible.

"Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r of Social Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Martin reported "significant[]" pain relief and "improving" activities of daily living with pain medication and epidural steroid injections (Doc. 10 at 602–03, 620, 636), and she testified at her hearing that her then-current pain medications were "more effective than the other medications [she] tried" (*id.* at 55). The ALJ reasonably relied on this evidence in concluding that Martin's pain was not disabling.

In sum, the Court concludes that substantial evidence supports the ALJ's finding that Martin's spinal impairments were not as severe as she alleged and that she was not precluded from performing sedentary level exertional activity.

Martin alleges that her symptoms associated with her degenerative disc disease have worsened and that she can no longer perform any basic chores at home. (Doc. 12 at 1.) If a claimant experiences worsening symptoms or the development of new symptoms since the date of the administrative hearing, the proper course is to file a new application for Social Security disability benefits. *Osenbrock v. Apfel*, 240 F.3d 1157, 1164, n.1 (9th Cir. 2001). Nothing in the

statute authorizing judicial review of social security decisions permits a reviewing court to consider evidence of the claimant's new or worsening condition after the ALJ's decision.  *See* 42 U.S.C. § 405(g) (providing that judicial review must be based "upon the pleadings and transcript of the record").  If the claimant can prove "a [new or worsening] disabling physical or mental impairment, he [or she] will be entitled to benefits as of the date of the new application."  *Sanchez v. Sec. of Health and Human Servs.*, 812 F.2d 509, 512 (9th Cir. 1987).  Martin may file a new application for disability benefits based on her allegedly worsening symptoms, but the Court may not consider such allegations in the context of reviewing the record support for the ALJ's decision as of the time of the hearing.

## III.   Martin's Fibromyalgia

Martin further claims in her brief that her fibromyalgia gives her "excessive pain throughout [her] whole body," causing her to remain in bed.  (Doc. 12 at 2.) She asserts that this prevents her from performing any physical activity when her fibromyalgia worsens, and she therefore disagrees with the ALJ that she can work. (*Id.*)

The ALJ's findings concerning Martin's fibromyalgia are supported by substantial evidence based on the ALJ's reasonable consideration of Martin's medical examinations, treatments, medications, and medical opinions in the record concerning this impairment.  (Doc. 10 at 27–30, 33, 339 (records from specialist

17

indicating that Martin failed to comply with 2015 recommendations for physical therapy and low-impact exercise for fibromyalgia management and discontinued Cymbalta), 348–49 (records from same provider recommending continuing Cymbalta and "working with psychiatry" for management of fibromyalgia), 354–55 (records from same provider recommending "gradual exercise plan, weight reduction, [and] stress management techniques" to manage fibromyalgia), 362–63 (records from same provider recommending education, gentle exercise, improvement in sleep, antidepressant such as Cymbalta or Effexor, and over-the-counter pain medication for fibromyalgia management), 499 (2017 strength examination results), 516 (2019 strength examination results), 697 (termination from specialist provider in December 2017).)  A rheumatologist's medical opinion regarding a claimant's fibromyalgia is entitled to "greater weight than those of other physicians" because "[r]heumatology is the relevant specialty for fibromyalgia" and requires specialized knowledge that is "particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community." *Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004).  The ALJ relied heavily on Martin's rheumatologist's conservative approach to treating her condition and her failure to comply with treatment recommendations.  (Doc. 10 at 28, 33.)  The ALJ's decision is supported by records reflecting that she did not comply with recommendations for gentle

18

exercise and physical therapy, she ceased taking the Cymbalta recommended to her despite reporting that it helped manage her pain, and her rheumatologist ultimately terminated her as a patient.  (*Id*. at 28, 339, 348–49, 362–63, 697.)  The ALJ also considered Martin's ability to function and found that examinations showed at or near normal strength.  (*Id*. at 28–29, 583, 693.)  Accordingly, the Court concludes that the ALJ properly considered Martin's treatment by her rheumatologist and other medical evidence to conclude that Martin did not meet her burden of demonstrating that her fibromyalgia met or medically equaled a listed impairment or of demonstrating that the evidence concerning her fibromyalgia justified additional functional limitations in the residual functional capacity assessment.

### IV.   Martin's Depression and Anxiety

Martin alleges that her depression and anxiety make her "unable to function in daily life activities."  (Doc. 12 at 2.)  She argues that even with medication, she struggles to get out of bed and to complete "even minimal tasks."  (*Id*.)  She asserts that she cannot make "minor decisions" regarding her own care as a result of her depression and anxiety.  (*Id*.)  She disagrees with the ALJ's decision denying her disability benefits because her mental health symptoms allegedly "make it unlikely that [she] would be able to do any substantial work activity" because she alleges she is "unable to even perform daily living activities."  (*Id*.)

Impairment listings 12.04 (depressive, bipolar, and related disorders) and

12.06 (anxiety and obsessive-compulsive disorders) each require the same criteria

found in Paragraphs B and C of each listing in 20 C.F.R. Part 404, Subpart P,

Appendix 1 §§ 12.04, 12.06.  Paragraph B requires "[e]xtreme limitation of one, or

marked limitation of two, of the following areas of mental functioning . . . :

1. Understand, remember, or apply information . . . .  2. Interact with others . . . .

3. Concentrate, persist, or maintain pace . . . .  4. Adapt or manage oneself."  *Id.*

Paragraph C requires:

> Your mental disorder in this listing category is "serious and persistent;"
> that is, you have a medically documented history of the existence of the
> disorder over a period of at least 2 years, and there is evidence of both:
>     1. Medical treatment, mental health therapy, psychosocial
> support(s), or a highly structured setting(s) that is ongoing and that
> diminishes the symptoms and signs of your mental disorder . . . ; and
>     2. Marginal adjustment, that is, you have minimal capacity to
> adapt to changes in your environment or to demands that are not already
> part of your daily life . . . .

*Id.*  A claimant who satisfies Paragraph A and Paragraph B or C of each listing

meets that impairment listing.  *Id.*  Substantial evidence supports the ALJ's

findings that Martin did not satisfy either the Paragraph B or Paragraph C criteria.

First, the ALJ found that Martin had no limitation in understanding,

remembering, or applying information because she had a college degree,

performed skilled work in the past, and her mental examinations showed an above

average fund of knowledge and good abstraction abilities.  (Doc. 10 at 24.)  The

multiple mental status examinations in the record, which describe good initial

recall and fair to good delayed recall, average to high average scores on memory

index testing except for a low average range on visual working memory, above

average knowledge fund, good to very good abstraction ability, "previously high

levels of good functioning," and "good" to "very good" "ability for understanding,

remembering, and applying information" (*id.* at 401–03 (March 2017), 486–93

(November 2017)), support these findings.

 This evidence also supports the evidentiary weight the ALJ assigned to the

opinions of consulting and treating providers concerning this criterion and others.

Martin's mental status examination results conflict with her treating provider Chris

Kolobow's opinion that Martin had documented findings of short-term memory

deficit and information processing limitations (*id.* at 508), and the ALJ therefore

appropriately assigned Kolobow's opinion limited weight.  *Ford*, 950 F.3d at 1154.

Similarly, Martin's mental status examination results conflicted with her treating

provider Kelly Wright's opinions that Martin had extreme limitations in

remembering information and moderate limitations in applying information (Doc.

10 at 576), and the ALJ appropriately assigned her opinion limited weight.  *Ford*,

950 F.3d at 1154.   The ALJ accurately observed that Martin's examining

consulting provider, Dr. Mahoney, did not opine in March 2017 that Martin was

incapable of working and recommended psychotherapy, but in November 2017, he

opined that Martin could not sustain employment without a reduction in anxiety and depression despite finding that she "appears to be functioning about the same now as she was" when he last examined her, and he failed to provide an explanation for his change in opinion.  (*Id.* at 31–32, 401–03, 486–93.) Accordingly, substantial evidence supports the ALJ's decision to assign great weight to Dr. Mahoney's March 2017 report, but only some weight to his November 2017 report.  *Ford*, 950 F.3d at 1154–55 ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002))).

Second, the ALJ found that Martin had mild limitation in interacting with others because although she self-isolated, she reported interacting regularly with her immediate family members, regularly leaving the house for shopping, appointments, or visiting family members, and she did not report social difficulties in her prior work, which involved working closely with others.  (Doc. 10 at 24.) These findings are supported by the record evidence of Martin's interactions with others and reports to healthcare providers.  (*Id.* at 52–54, 218–19, 237, 293, 402–03, 408, 486, 680.)  This evidence also conflicts with Kolobow and Wright's opinions documenting extreme limitations in social interaction (*id.* at 510, 576),

which further supports the ALJ's decision to assign less weight to those providers' opinions.

Third, the ALJ found that Martin had moderate limitation in concentrating, persisting, or maintaining pace, citing evidence that Martin performed "fairly well" and was reported to be able to focus and maintain continual attention in her mental status examinations, but she alleged and testified about "significant difficulty functioning in this domain," and records indicated that she was pre-occupied with her physical pain and other symptoms, which "would reasonably be expected to interfere with the claimant's ability to function in this domain, but only to a moderate degree." (Doc. 10 at 24.) These findings are supported by her performance on mental status examinations showing continual attention and focus, good concentration, and adequate pace (*id.* at 401–03, 485–86, 493), evidence of no preoccupation during examinations but simultaneous reports of stress due to pain (*id.* at 402, 486), and the opinion of Dr. Mahoney to which the ALJ appropriately assigned great weight based on the same evidence (*id.* at 403). This evidence conflicts with Kolobow's report of documented medical findings of concentration limitations and Kolobow's and Ms. Wright's opinions of extreme limitation in concentration, persistence, and pace (*id.* at 508, 576), providing further support to the ALJ's decision to give these opinions limited weight.

23

Fourth, the ALJ found that Martin had experienced a moderate limitation in adapting or managing herself, citing evidence that she had not followed recommendations to engage in physical activity, she reported using food and other substances as self-medication, and she and her husband reported that she required reminders and assistance with her medication and other activities; the ALJ concluded that her mental condition "would reasonably be expected to cause some difficulty in her ability to function in this domain, but only to a mild degree." (Doc. 10 at 24.)  These findings are supported by Martin's testimony and reports to healthcare providers, including reports of noncompliance with treatment recommendations (*id.* at 54–56, 339–65, 372–73, 376, 388–95, 401, 485, 496, 516–17, 690–94, 1734, 1753, 1756, 1758, 1771, 1779), the activities described in her function report (*id.* at 218, 235, 243), and Dr. Mahoney's March 2017 opinion, to which the ALJ properly assigned great weight based on the foregoing evidence (*id.* at 402–03 (describing difficulty with decision-making based on self-doubt and overthinking, pessimistic and self-directed thinking, and opinion that Martin "is probably capable of managing better than she does").  This evidence also conflicts with Wright's report of "extreme" limitation in adapting and managing oneself in the workplace (*id.* at 576), further supporting the ALJ's decision to give that opinion limited weight.  In sum, the ALJ's findings that Martin did not satisfy the Paragraph B criteria are supported by substantial evidence.

As to the Paragraph C criteria, the ALJ found that Martin's "mental disorders are not serious and persistent to the point that [she] has had extensive medical treatment and can make only marginal adjustment to adapt to changes in her environment or to the demands that are already part of her daily life." (Doc. 10 at 24.)  The Court is skeptical of the ALJ's finding that Martin had not had extensive medical treatment for her mental disorders given the record evidence of her longstanding history of anxiety and depression and consistent use of anti-anxiety medication, although this finding may be adequately supported by the evidence of Martin's very limited participation in psychotherapy and inconsistent use of antidepressant medication.  (*E.g.*, *id.* at 351–56 (Cymbalta and Xanax use and referral for psychiatric management for chronic anxiety and major depression in August 2015), 391–94 (noting discontinuation of antidepressants against medical advice, Xanax use in December 2016), 421–26 (records of individual psychological counseling from May to June 2017), 1773 ("returning here for ongoing management of her anxiety," Xanax and Prozac use in September 2019).)  However, any error in that determination is harmless because substantial evidence supports the ALJ's finding that Martin did not provide sufficient evidence of marginal adjustment as required by criterion C2, which requires evidence that "changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become

25

unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00G2c. That finding is supported by Martin's function report, in which she reported that she was capable of some self-care tasks, chores, driving, shopping, and occasionally leaving her home to visit family (Doc. 10 at 235–37), her performance on mental status examinations and interactions with healthcare providers described above, her noncompliance with medical advice concerning psychological medications (*id.* at 391) and recommendations for physical exercise and physical therapy described above, and the opinion of Dr. Mahoney to which the ALJ assigned great weight based on its consistency with the objective record evidence, which opined that Martin was "probably capable of managing better than she does" (*id.* at 403). The ALJ appropriately acknowledged that Martin has moderate difficulty with adapting to changes but found that the objective medical evidence of record did not support a finding that she was as limited in her ability to function as she alleged in her application or as she reported to medical providers. (*Id.* at 32–33.)

The same evidence also supports the ALJ's residual functional capacity assessment as it relates to Martin's mental health disorders. In addition to the evidence discussed above, the ALJ properly considered Martin's ability to perform some activities of daily living. (Doc. 10 at 33.) "[T]he ALJ may discredit a

claimant's testimony when the claimant reports participation in everyday activities that are transferable to a work setting . . . .  Even when everyday activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1113.  Martin reported that she was able to use her computer for much of the day, interact with her family and socialize with others, perform some household chores, and run errands.  (*E.g.*, Doc. 10 at 33, 237, 218–20, 235–37.)  This evidence undermines Martin's claim that she is "unable to function in daily life activities." (Doc. 12 at 2.)  The ALJ properly accounted for Martin's limitations in the residual functional capacity's limitations of a sedentary exertional level, low stress work, not more than occasional changes in work setting or job duties, and no high production or pace work.  (Doc. 10 at 25, 33.)

For all of the reasons discussed above, the ALJ's conclusions that Martin's impairments in combination did not support a finding of disability and that Martin was capable of sedentary work with the limitations set forth in her residual functional capacity likewise are supported by substantial evidence.  In sum, the Court concludes that the ALJ's findings that Martin is not disabled are supported by substantial evidence.

## ORDER

Accordingly, IT IS ORDERED that the Commissioner's decision is AFFIRMED, and this case is DISMISSED.  The Clerk of Court shall close this matter and enter judgment in favor of the Commissioner pursuant to Rule 58 of the Federal Rules of Civil Procedure.

DATED this 15th day of April, 2022.

_____
Dana L. Christensen, District Judge
United States District Court